

# THE ATTORNEY GENERAL

# OF TEXAS

## AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

August 28, 1951

Hon. Morris Rolston
District Attorney
7th Judicial District
Mt. Pleasant, Texas

Opinion No. V-1261

Re: Authority of a county
school board to use
State transportation
aid funds for other
school purposes and
related questions.

Dear Sir:

We refer to your request concerning the authority of a county school board to use State transportation aid funds for other school purposes and related penal law questions. You ask:

1. Is it a violation of any penal law of Texas, either while the rural aid bill (H. B. 295, Acts 50th Leg., 1947, ch. 228, p. 401) was in effect or since the effective date of the Foundation School Program (S.B. 116, Acts 51st Leg., R. S. 1949, ch. 334, p. 625, codified as Arts. 2922-11 through 2922-22, V. C. S.), for a county school board to use its State transportation aid funds for school purposes other than transportation purposes for which they were allocated by the State?

2. Would a county superintendent, since the effective dates of House Bill 295 and Senate Bill 116, supra, who executes as secretary of the county school board and approves a school voucher as such superintendent, which was signed by the president of the county board, which transfers money out of the county's school transportation fund to the administration fund of a common school district of his county, be guilty of any penal offense?

House Bill 295, Acts 50th Leg., supra, was the State equalization aid law for the biennium ending August 31, 1949. Article V of that law authorized transportation aid in certain amounts and on certain conditions.

Section 2 of Article XIII allocated $6,350,000.00 as State transportation aid for each year of the biennium. The county was regarded as the unit and the State warrant was made payable to the County Board Transportation Fund. The County School Board was required by that law to distribute the funds equitably to districts operating such transportation system.

Section 3 of Article IX provided:

"Any school which has received any payments of State Funds in excess of the amount to which it was legally entitled shall be ineligible for any type of aid under the provisions of this Act unless and until the amount of excess payments has been refunded to the State Treasury."

Article XV provided:

"Any district violating any of the provisions of this Act shall forfeit all rights to such aid and shall be disqualified to receive any aid of any nature under any Article of this Act for the current year. Should any school district, which would otherwise be eligible to receive aid, fail to use the Funds for the exact purpose for which they were allocated in the approved budget, such school district becomes ineligible for further aid until such offense is corrected. The amount of money granted for each type of aid except tuition shall be set up as a separate account and shall be made only for the specified purposes for which such money was granted. It shall be unlawful for any county school superintendent or the superintendent of any common or independent school district, school teacher, county trustee, and/or district trustee, or any other person to use or promise to use, pay or promise to pay, any of the Funds herein appropriated for the purpose of paying the salary and/or expense of any person or persons to maintain a lobby for any purpose."

This law made clear that State aid allocated for transportation legally could be used only for the

exact purpose for which it was appropriated. Any school district which failed to use such funds for such purpose was rendered ineligible for further aid (tuition, salary, or transportation) under that act until the offense was corrected. Under this law the school district was made to suffer the penalty of ineligibility for the wrongs committed by the local school officials in misapplying such State funds. Thus, the transfer of transportation funds by the county board to some other school fund under House Bill 295 did not subject the officers participating in the transfer to criminal liability.

House Bill 295, supra, was superseded by the comprehensive school legislation of 1949, the Gilmer-Aiken laws, Senate Bills 115, 116, and 117, Acts 51st Leg., R. S. 1949, chs. 299, 334, 335, pp. 537, 625, 647. Under Senate Bill 116, codified in Vernon's Civil Statutes as Articles 2922-11 to 2922-22, a minimum Foundation School Program is established and made available to all school districts in Texas.

Part of the costs which enter into the determination of the sum necessary to operate a Foundation Program in a school district is for transportation of its scholastics. Prior to an amendment effective May 17, 1951 ( S. B. 90, Acts 52nd Leg., 1951, ch. 198, p. 325), Section 2 of Article 2922-15, V. C. S. (S. B. 116, Art. V, Sec. 2), provided with respect thereto:

"The County Superintendents and County School Boards of the several counties . . . are hereby authorized to annually set up the most economical system of transportation possible for the purpose of transporting pupils . . . The county shall be regarded as the unit and state warrants for transportation shall be made payable to a County School Transportation Fund in each county for the total transportation earned within the county to the extent allowed under the provisions of this Act and which shall not exceed the total actual approved cost thereof.

"The total annual transportation cost allotment for each district shall be the lesser of the following:

"a. . . ./Authorizes allotments of $31.50 per pupil for nine months' transportation of certain public school pupils in most

counties, graduating to $63.00 per pupil in
designated sparse counties/

"b. The actual approved cost of trans-
portation operation in the district, such
cost to include bus payment reimbursements,
bus driver salaries, and gasoline, oil and
repairs."

In authorizing transportation allotments based
on the lesser of these two amounts, it is apparent that
the Legislature intended that these allotments under Sen-
ate Bill 116 should be used only for transportation pur-
poses. It was contemplated that a county school trans-
portation fund should not receive an allotment in excess
of the amount necessary for defraying the actual expenses
of transportation. This intent is made more certain by
the following provision of Article 2922-21 (Art. XI of
S. B. 116):

". . . Should any change or error in
the records, forms, reports or budgets re-
sult in any school district receiving from
the Foundation School Fund more or less than
it would have been entitled to receive had
said records been correct, the State Commis-
sioner of Education shall correct such error,
and so far as practicable shall adjust the
payment in such a manner that the amount to
which such district was correctly eligible
shall be paid."

In Section 2, subdivision (f), of Article 2922-
15 as amended by Senate Bill 90, supra, it is specifically
provided, as follows:

". . . All funds paid to the several
transportation units for the operation of
transportation systems of the State shall be
expended for no other purpose. . . ."

Thus, the intent of Senate Bill 116 prior to this amend-
ment is made clear by the incorporation therein of this
specific legislative expression.

But the penalty provisions in Senate Bill 116
are dissimilar to those of the preceding State equaliza-
tion law, House Bill 295, supra. They do not render a

district ineligible for any or all State aid where a local school official, county or district, violates the purposes of Senate Bill 116, such as using allocated State aid for school purposes other than those for which they were appropriated. Its penalty provisions are directed at the parties perpetrating the wrong, rather than to the beneficiary local school systems. The policy of that law seems to be not to punish the school districts for the wrongs of its agents.

These penalty provisions, Article XI of Senate Bill 116, are codified as Article 2922-21, V. C. S., which provides in part as follows:

"Section 1. Any person who shall confiscate, misappropriate or convert moneys appropriated to the Foundation School Fund to carry out the purposes of this Act after such moneys are received by the school district or County Board of School Trustees in accordance with the terms hereof, shall be guilty of a felony and upon conviction be punished by confinement in the State Penitentiary for any term of years not less than one (1) nor more than five (5). Any person who shall knowingly make any false statement, or shall falsify or permit to be falsified, any record, form, report or budget required under this Act, or the rules of the State officials charged with the enforcement of this Act, in any attempt to defraud the State or its school system as a result of such Act, shall be guilty of a felony, and upon conviction shall be punished by confinement in the State Penitentiary for any term of years not less than one (1) nor more than five (5). . . .

"Sec. 2. Any person, including any county superintendent or ex-officio county superintendent, school bus driver, school trustee, of any district superintendent, principal or other administrative personnel, or teacher of a school district, or its treasurer or proper disbursing officer, who violates any of the provisions of this Act other than those to

which Section 1 of Article XI of this Act
applies, shall be guilty of a misdemeanor
and shall be fined not less than One Hun-
dred ($100.00) Dollars nor more than One
Thousand ($1,000.00) Dollars. . . .

"Provided further, that if any person
shall knowingly submit incorrect information
to the Central Education Agency in any sworn
report required by this Act or by the rules
of the Agency or the State Commissioner of
Education for the honest administration of
this Act, such offenses shall constitute
false swearing and shall be punished as
prescribed by law for that offense."
(Emphasis added.)

Webster's New International Dictionary (2nd Ed.)
1938) defines "misappropriate" as follows:

"To appropriate wrongly or misapply
in use, exp. wrongfully and for oneself."

That same authority defines "convert" to mean "to appro-
priate dishonestly or illegally," and defines "conver-
sion" as "An appropriation of, and dealing with, the
property of another as if it were one's own, without
right; . . ."

The term "misappropriate" as used in Section 1
of Article 2922-21, we think, means to convert or put to
one's own use any of the Foundation School Funds allocated
and received by school districts and county school boards
for the purposes set out in Senate Bill 116. Therefore,
any person who uses any of such funds for his own purposes
commits a felony, and Section 1, supra, would have appli-
cation.

But if any such transportation funds are used
for a school purpose other than one for which they were
appropriated and allocated, the person or persons so vi-
olating an expressed provision of Senate Bill 116 in that
respect would be subject to prosecution under the provis-
ions of Section 2, Article 2922-21, and upon conviction
for the misdemeanor would be subject to a fine of not less
than $100.00 nor more than $1,000.00

As previously pointed out, prior to the amendment by Senate Bill 90, supra, (effective May 17, 1951), Senate Bill 116, supra, had no provision which expressly prohibited the use of transportation funds for purposes other than operation of transportation systems. But by Senate Bill 90, subdivision (f) of Section 2, Article 2922-15, was amended to provide specifically that ". . . All funds paid to the several transportation units for the operation of transportation systems of the State shall be expended for no other purpose."

The policy of our system of criminal law is stated in Article 7 of the Penal Code as follows:

". . . and no person shall be punished for an offense which is not made penal by the plain import of the words of a law."

In Ratcliff v. State, 106 Tex. Crim. 37, 289 S. W. 1072, 1075 (1926), the court quotes statements from Black, Interpretation of Laws (1896), which appear to be applicable here:

"It is not enough that the case may be within the apparent reason and policy of the legislation upon the subject, if the Legislature has omitted to include it within the terms of its enactments. What the Legislature has, from inadvertence or otherwise, omitted to include within the express provisions of a penal law, reasonably construed, the courts cannot supply."

"To create offenses by mere construction is not only to entrap the unwary, but to endanger the rights of the citizen."

And in State v. Kingsbury, 37 Tex. 159 (1872), the Supreme Court, in affirming a judgment sustaining exceptions to an indictment for unlawfully approving an account against the county, stated:

"By Article 1605, Paschal's Digest, it is declared 'that no person shall be punished for any act or omission as a penal offense, unless the same is expressly defined, and the penalties affixed by the written law of the State.' There is no written law of this State expressly defining the act of the County Court in unlawfully approving an account against the

county, as a penal offense . . ."

Article 1605 of Paschal's Digest has been brought forward into the present Penal Code as Article 3, by which it is declared that "no person shall be punished for any act of omission, unless the same is made a penal offense, and a penalty is affixed thereto by the written law of this State."

While House Bill 295, supra, was in effect, prosecutions for false swearing under Article 310, V.P. C., were available then as now. But for other violations under House Bill 295, that bill prescribed the drastic penalty of rendering the entire school district ineligible for State aid. Under Senate Bill 116, supra, now in effect, any person who violates an express provision of that law is, by the express provisions of that law, subject to prosecution.

Accordingly, if a member or members of the county school board or a county school superintendent by his or their several acts diverts moneys allocated to the county school transportation fund from the State Foundation School Fund to purposes other than transportation, subsequent to the effective date of Senate Bill 90, supra, he or they are subject to prosecution under Section 2 of Article 2922-21, V. C. S., for violation of an express provision of Senate Bill 116, supra. But since there was no express provision in Senate Bill 116 prior to the amendment of Senate Bill 90 specifically prohibiting the use of allocated transportation funds for other school purposes, then there could be no criminal liability for such transfers, for the reason that the law as then written did not expressly prohibit or limit the use of such funds for transportation purposes. Since Senate Bill 116, prior to amendment by Senate Bill 90, did not contain the express prohibition inserted by that bill, there could be no violation of a transportation fund provision of the law as it then existed such as would constitute a crime under Section 2 of Article 2922-21.

With respect to the second question, it is for the prosecutor to determine, of course, whether the money transferred from the county transportation fund to the administrative fund of a common school district was lawfully transferred to cover transportation costs of that district or whether it was transferred for unauthorized and unlawful purposes.

## SUMMARY

Under House Bill 295, Acts 50th Leg., 1947, ch. 228, p. 401, or under Section 2, Article V, Senate Bill 116, Acts 51st Leg., R. S. 1949, ch. 334, p. 625, prior to amendment in 1951, transfer of transporation funds by a county school board to some other school fund for purposes other than transportation did not subject the officers participating in the transfer to criminal liability.

Under Section 2 of Article V, Senate Bill 116, supra, (Art. 2922-15, Sec. 2, subd. (f), V. C. S.), as amended by Senate Bill 90, Acts 52nd Leg., R. S. 1951, ch. 198, p. 325 (effective May 17, 1951), transfer of transportation funds by a county school board to some other school fund for purposes other than transporation would subject the officers participating in the transfer to criminal liability. Art. 2922-21, Sec. 2, V. C. S.

APPROVED:

J. C. Davis, Jr.
County Affairs Division

Everett Hutchinson
Executive Assistant

Price Daniel
Attorney General

Yours very truly,

PRICE DANIEL
Attorney General

By Chester E. Ollison
Chester E. Ollison
Assistant

CEO:mw:awo